Opinion
 

 ANDERSON, P. J.
 

 Today we consider whether an insurer that promptly pays the claim of its insured is barred from subrogation from the actual tortfeasor because the insurer could have legitimately denied the claim as excluded. From time to time and in a variety of situations, the “volunteer” rule has been invoked to curtail an insurer’s ability to pursue equitable subrogation against a tortfeasor who caused damage to its insured. As a general rule equitable subrogation has not been awarded to one who has
 
 *772
 
 officiously, and as a mere interloper, paid the debt of another without any moral or legal duty to do so.
 
 (Guy
 
 v.
 
 Du Uprey
 
 (1860) 16 Cal. 195, 199-200;
 
 Grant v. de Otte
 
 (1954) 122 Cal.App.2d 724, 728-729 [265 P.2d 952];
 
 Caito
 
 v.
 
 United California Bank
 
 (1978) 20 Cal.3d 694, 704 [144 Cal.Rptr. 751, 576 P.2d 466].)
 

 We hold that an insurer does not necessarily act as a mere volunteer when it pays its insured under a valid homeowners policy and where the loss falls under the general grant of coverage, even though coverage in all likelihood is precluded under policy exclusions. This is especially true when, as here, the tortfeasor delays accepting responsibility while the insureds are rendered homeless and are faced with an imminent need for shelter and repairs. This, together with the recent intense scrutiny of claims handling practices of California homeowners insurers, convinces us that appellant insurer did
 
 not
 
 act as a mere volunteer in paying its insureds’ claim and
 
 is
 
 therefore entitled to equitable subrogation against the tortfeasor. Accordingly, we reverse summary judgment in favor of respondent tortfeasor.
 

 I. Facts
 

 A.
 
 The Accident and Claim
 

 Effective November 14, 1992, through November 15, 1993, appellant State Farm Fire and Casualty Company (State Farm) insured the home of Harold and Kathleen Anthony under a “Homeowner’s Extra Policy” of insurance. The policy provided coverage for “accidental direct physical loss” to the property, except as excluded under the “Losses Not Insured” provisions. On or about January 15, 1993, a water pipe owned, installed and maintained by respondent East Bay Municipal Utility District (EBMUD) burst in the vicinity of the Anthonys’ Walnut Creek home, causing flooding on the premises. As a result of this event, the clay soils underlying the Anthonys’ foundation became saturated, causing damage to the foundation. The Anthonys did not become aware of noticeable signs of distress to their home until that August.
 

 The Anthonys lodged a claim with State Farm for their losses. EBMUD became involved in determining causation and reviewing damages. As of the middle of 1994, State Farm’s internal files indicated its understanding that “EBMUD has accepted liability . . . .”
 

 The engineer who evaluated the distress to the Anthonys’ home, at the request of EBMUD’s handling adjuster, concluded that “the flooding of the foundation soils around the house south and west sides probably did contribute substantially to the current house cosmetic distress. . . .” This engineer considered a few of the proposed items of repair to be “upgrades” and
 
 *773
 
 EBMUD expressed to State Farm its disagreement with State Farm’s valuation of the claim.
 

 State Farm paid the Anthonys $117,906.12 to repair the foundation, relevel the home, replace damaged patios and walkways, replace the sub-drain system, repaint and repatch the interior and exterior, and perform other items of repair. Additionally, State Farm paid over $10,000 for living expenses while the Anthonys relocated pending repairs.
 

 B.
 
 Litigation
 

 State Farm and EBMUD engaged in settlement negotiations. In May 1995 EBMUD’s insurance adjuster offered State Farm $17,554. State Farm rejected that offer and filed suit in October 1995. EBMUD moved for summary judgment on grounds that State Farm voluntarily paid the Anthonys’ claim and, therefore, was not entitled to seek equitable subrogation.
 

 EBMUD argued that the Anthonys’ property damage claim was excluded from coverage under relevant policy exclusions and the recent case of
 
 Waldsmith
 
 v.
 
 State Farm Fire & Casualty Co.
 
 (1991) 232 Cal.App.3d 693 [283 Cal.Rptr. 607] and, thus, State Farm had no obligation to pay. EBMUD relied on several exclusions under the “Losses Not Insured” section of the policy, as set forth in the margin.
 
 [1]
 

 
 *774
 
 The trial court granted summary judgment in favor of EBMUD. It found that the damage was caused by earth movement and flooding due to rupture of an EBMUD water pipe, and coverage for such harm was excluded under the insureds’ policy. The trial court pointed out that in the factually similar
 
 Waldsmith
 
 case, the Court of Appeal had determined there was no coverage under the same policy exclusions as were present in the Anthonys’ policy. The trial court concluded State Farm acted as a volunteer and could not take advantage of the equitable remedy of subrogation. This appeal followed.
 

 II. Analysis
 

 Equitable subrogation allows one who has been required to pay a loss created by a third party to “step into the shoes” of the party suffering the loss and recover from the wrongdoer.
 
 (Self-insurers’ Security Fund
 
 v.
 
 ESIS, Inc.
 
 (1988) 204 Cal.App.3d 1148, 1155 [251 Cal.Rptr. 693].) The insurer’s cause of action for equitable subrogation has these elements: (1) the insured has suffered a loss for which the party to be charged is liable, through act or omission or legal responsibility; (2) the insurer has compensated the insured for that loss; (3) the insured has an existing, assignable cause of action against the party to be charged, which the insured could have pursued absent compensation by the insurer; (4) the insurer has suffered damages caused by the act or omission which triggers the liability of the party to be charged; (5) justice requires that the loss should be shifted entirely from insurer to the party to be charged; and (6) the insurer’s damages are in a stated sum, usually the amount paid to the insured, “. . . ‘assuming the payment was not voluntary and was reasonable.’ ”
 
 (Fireman’s Fund Ins. Co.
 
 v.
 
 Maryland Casualty Co.
 
 (1994) 21 Cal.App.4th 1586,1596 [26 Cal.Rptr.2d 762];
 
 Patent Scaffolding Co.
 
 v.
 
 William Simpson Constr. Co.
 
 (1967) 256 Cal.App.2d 506, 509 [64 Cal.Rptr. 187].)
 

 Over the years, courts have liberalized their interpretation of the “interest” that must be at stake to avoid being dubbed a volunteer. Thus, in
 
 Employers etc. Ins. Co.
 
 v.
 
 Pac. Indem. Co.
 
 (1959) 167 Cal.App.2d 369 [334 P.2d 658], the reviewing court extended the right of subrogation to a plaintiff who, although not liable under its insurance contract for the third party’s claim, nonetheless settled out of court. There, plaintiff and defendant both insured a construction company. Plaintiff’s policy provided comprehensive liability coverage, but not for vehicle accidents occurring away from company
 
 *775
 
 premises; defendant’s policy covered automobile risks. A truck driver, “rented," with his truck, to the company, was seriously injured due to the negligence of the company’s employees while loading his truck at a railroad yard not owned, rented or controlled by the company. The driver sued the construction company and, although the company twice tendered defense to defendant, it refused to defend.
 

 In grappling with the question whether, because plaintiff was not bound under its policy to indemnify and defend the company, it was acting as a mere volunteer, the court first noted that subrogation is an equitable doctrine, “administered so as to secure justice without regard to form. . . . Subrogation extends to those parties who pay in the performance of a legal duty by contract or rules of law, who pay in order to protect their own rights or interest, and whose payments are favored by public policy.”
 
 (Employers etc. Ins. Co.
 
 v.
 
 Pac. Indem. Co., supra,
 
 167 Cal.App.2d at p. 376.)
 

 The court went on to explain that even though plaintiff had no legal obligation to pay, nevertheless it had an interest to protect. Plaintiff’s action in joining the settlement was reasonable because defendant had erroneously insisted that plaintiff’s policy pertained and its own did not. Moreover, plaintiff had a moral obligation to protect the company because, in procuring insurance from both insurers, the company thought it was fully protected. Further, in making the payment, plaintiff protected a very valuable business relationship.
 
 (Employers etc. Ins. Co.
 
 v.
 
 Pac. Indem. Co., supra,
 
 167 Cal.App.2d at p. 377.) Thus, in paying the settlement, the insurer was acting to protect the best interests of his company.
 
 (Id.,
 
 at p. 378.) Finally, the court concluded: “ ‘It would seem that one acting in good faith in making his payment, and under a reasonable belief that it is necessary to his protection, is entitled to subrogation, even though it turns out that he had no interest to protect.’ ”
 
 (Id.,
 
 at p. 379.)
 

 Just as courts have taken an expansive view of the interest needed to support subrogation, so too, have they accepted less than ironclad proof of the insurer’s liability under the policy in order to defeat a finding of “voluntary” payment to the insured. In
 
 Agricultural Ins. Co.
 
 v.
 
 Smith
 
 (1968) 262 Cal.App.2d 772 [69 Cal.Rptr. 50], the trial court insisted that the insurer prove the contents of the policy by producing the policy; secondary evidence would not do. The trial court reasoned that defendant tortfeasor was entitled to see the policy to make sure that the insurer had asserted all the defenses it might have asserted.
 
 (Id.,
 
 at pp. 777-778 and fn. 4.)
 

 Reversing, the reviewing court explained: “. . . Public policy favors the prompt payment of claims made by an insured against an insurer and
 
 *776
 
 disfavors assertion by an insurer of technical defenses to avoid liability on the policy. [Citation.] Were an insurer’s right to subrogation imperiled unless it asserted all potential defenses against its insured before it paid a claim on the policy, the obvious result would be that insurers would resist prompt payment of claims. That result cannot be supported upon the principles of either equity or common sense. It is particularly indefensible where the person insisting upon that course of action is prima facie proved to be a tortfeasor whose wrong caused the loss.”
 
 (Agricultural Ins. Co.
 
 v.
 
 Smith, supra,
 
 262 Cal.App.2d at p. 779.)
 

 The Anthonys submitted a claim under their policy to State Farm. The policy was in effect, and provided coverage for “accidental direct physical loss to property.” Once, as here, the insured shows that an event comes within the scope of basic coverage under the policy, the burden shifts to the insurer to prove that a claim is otherwise excluded.
 
 (Garvey
 
 v.
 
 State Farm Fire & Casualty Co.
 
 (1989) 48 Cal.3d 395, 406 [257 Cal.Rptr. 292, 770 P.2d 704].) And, by now the law is crystal clear that exclusionary clauses are interpreted narrowly, while clauses identifying coverage are interpreted broadly.
 
 (Ibid.)
 

 Furthermore, in first party insurance cases, the benefit which the insured contracts for is the prompt payment of benefits due upon the happening of the event insured against.
 
 (Austero
 
 v.
 
 National Cas. Co.
 
 (1978) 84 Cal.App.3d 1, 29-30 [148 Cal.Rptr. 653], disapproved on other grounds in
 
 Egan
 
 v.
 
 Mutual of Omaha Ins. Co.
 
 (1979) 24 Cal.3d 809, 824, fn. 7 [169 Cal.Rptr. 691, 620 P.2d 141].) This is not to say, as EBMUD points out, that good faith performance on the part of the insurer means the insurer has to pay every claim presented to it. Of course not.
 

 But certainly an insurer cannot be held to act in anything except
 
 good faith
 
 when it pays a claim that comes, on first glance, within the scope of basic coverage. The question becomes whether such payment is
 
 unreasonable
 
 in light of a recent appellate decision finding no coverage under similar facts and near-identical policy exclusions.
 
 [2]
 
 EBMUD takes the position that
 
 it is
 
 unreasonable when “decisions definitively declare that a particular claim is
 
 *777
 
 not covered,” citing
 
 Fireman’s Fund Ins. Co.
 
 v.
 
 Maryland Casualty Co., supra,
 
 21 Cal.App.4th 1486. There, the primary carrier settled with the insured. The settlement allocated the primary’s contribution to the latest four of six policy periods. The excess insurer, whose policy covered only the last year, also settled, then sought recovery from the primary on a theory of equitable subrogation, arguing that the primary was obligated to pay policy limits for all six years. On appeal the reviewing court pointed out that the excess insurer “could not have reasonably believed” it would be liable for damages accruing during the primary’s tenure, “because the courts had by then definitively declared a later insurer was not liable for damages manifested in an earlier policy period.”
 
 (Id.,
 
 at p. 1598, fn. 12.) Thus, since the excess insurer had no actual or potential obligation, it paid as a volunteer and could not seek equitable subrogation.
 
 (Id.,
 
 at p. 1598.)
 

 Fireman’s Fund
 
 does not require denial of equitable subrogation in this case. First, there is the obvious difference between paying for damages that did not accrue during the insurer’s tenure, and paying for a claim that comes within the general coverage, but to which an exclusion probably applies. Again,
 
 Garvey
 
 is clear that when an insured’s loss is covered under the basic grant of insurance, in order to deny coverage the insurer must prove by a preponderance of the evidence that the loss is specifically excluded.
 
 (Garvey
 
 v.
 
 State Farm Fire & Casualty Co., supra,
 
 48 Cal.3d at p. 406.) And if State Farm had
 
 denied
 
 the Anthonys’ claim, it might have been sued.
 

 Second, the defendant in
 
 Fireman’s Fund
 
 was the primary insurer which settled with the insured and obtained a release from all further claims. Thus, a key element of equitable subrogation was missing because there was no existing cause of action that the insured could have assigned or asserted against the primary insurer. Here, the Anthonys had an assignable cause of action against EBMUD. But more importantly, the defendant is the tortfeasor attempting to escape liability by asserting a technical defense based on its reading of an insurance contract to which it is not even a party. Nor is EBMUD an additional insured or third party beneficiary under that contract; thus, it has no
 
 contractual
 
 basis to challenge State Farm’s payment or denial of the claim. EBMUD suggests that State Farm has some duty to evaluate a claim for possible exclusions but, again, State Farm does not owe that—or any other duty—to EBMUD.
 

 Third, public policy favors prompt payment to the insured for losses occurring during the policy period. EBMUD, although it accepted responsibility, disputed what was needed to make the Anthonys whole. Meanwhile,
 
 *778
 
 State Farm, probably erroneously, decided the loss was covered under the Anthonys’ policy and chose to proceed in a timely fashion to satisfy its insureds’ claim.
 

 If, as EBMUD maintains and
 
 Waldsmith
 
 suggests, State Farm was wrong in its conclusion, does that mean it was a volunteer and, therefore, cannot recover from the tortfeasor? We think not. “A subrogation action by an insurer is not a suit on the insurance contract, but an independent action in which equitable principles are applied to shift a loss for which the insurer has compensated its insured to one who caused the loss . . .
 
 and whose equitable position is inferior to the
 
 insurer’s.”
 
 (Agriculture Ins. Co.
 
 v.
 
 Smith, supra,
 
 262 Cal.App.2d at pp. 777-778, italics added.)
 

 The equities clearly favor State Farm. We hold that in the context of payment by an insurer to its first party insured, where the loss is covered under the basic grant of coverage, without regard to policy exclusions, the insurer is not necessarily a volunteer even in the face of authority suggesting that policy exclusions would have precluded coverage. More is at stake than proving applicability of policy exclusions.
 

 It bears emphasizing at this point that the insurer’s duty of good faith requires it to “give at least as much consideration” to the insured’s interest as it does its own.
 
 (Egan
 
 v.
 
 Mutual of Omaha Ins. Co., supra,
 
 24 Cal.3d at pp. 818-819.) Thus, an insurer cannot elevate its interest in avoiding claims above the insured’s interest in getting the protection against calamity for which he or she bargained. Here, there was an existing contractual relationship between insureds and insurer, and an expectation on the part of the insured tendering the claim that the basic grant of coverage would compensate the loss. The tortfeasor had not accepted its responsibility on as timely a basis as had the insurer; rather, the tortfeasor was waiting, reviewing, reestimating—and all the while the insureds were living with the loss and the need, literally and figuratively, to right their home. Under these circumstances the insurer acted in a reasonable and morally responsible manner by timely paying the claim and
 
 then
 
 seeking subrogation.
 

 Moreover, we cannot ignore that the claims practices of California providers of homeowners insurance have been exposed to intense public scrutiny and criticism in the wake of recent earthquake and fire disasters which have damaged thousands of homes in our state. Thus, in this particular climate when an insured’s home is damaged due to no fault of the homeowner, it could also be said that the insurer acts to protect the industry and the insurance relationship by responding promptly to claims that fall within
 
 *779
 
 the basic coverage despite the probable applicability of policy exclusions. Further, public policy encourages State Farm’s prompt satisfaction of its insurers’ claim herein. To hold otherwise will only result in tardy satisfaction of legitimate claims and lead to more litigation as insurers are forced to justify their denial of coverage when defending bad faith claims.
 

 For all these reasons we conclude that equity will not countenance the trumping of State Farm’s right of subrogation by the volunteer doctrine; therefore, we reverse the judgment. EBMUD is to pay costs on appeal.
 

 Reardon, J., and Hanlon, J., concurred.
 

 [1]
 

 Paragraph 3: “We do not insure under any coverage for any loss which is caused by one or more of the items below, regardless of whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:
 

 e:
 

 “b. Earth Movement, meaning the sinking, rising, shifting, expanding or contracting of earth, all whether combined with water or not. Earth movement includes but is not limited to landslide, mudflow, sinkhole, subsidence and erosion. . . .
 

 it
 

 “c. Water Damage, meaning:
 

 “(1) flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, all whether driven by wind or not;
 

 “(2) water from outside the plumbing system that enters through sewers or drains. . . .” (Bold-faced type in original.)
 

 Paragraph 4: “We do not insure for loss described in paragraphs 1., 2. and 3. immediately above regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss:
 

 “a. conduct, act, failure to act, or decision of any person, group, organization or governmental body whether intentional, wrongful, negligent, or without fault; or
 

 “b. defect, weakness, inadequacy, fault or unsoundness in:
 

 “(1) planning, zoning, development, surveying, siting;
 
 *774
 
 “(2) design, specifications, workmanship, construction, grading, compaction;
 

 “(3) materials used in construction or repair; or
 

 “(4) maintenance;
 

 “of any property (including land, structures, or improvements of any kind)whether on or off the residence premises.”
 

 [2]
 

 In
 
 Waldsmith
 
 v.
 
 State Farm Fire & Casualty Co., supra,
 
 232 Cal.App.3d 693, the parties stipulated that a city water main “ ‘was negligently maintained, broke, saturated the soil causing a landslide which destroyed plaintiffs’ house.’ ”
 
 (Id.,
 
 at p. 695.) For purposes of deciding coverage, the parties also stipulated that the efficient proximate cause of the loss was negligence on the city’s part.
 
 (Id.,
 
 at p. 696.) The homeowners policy contained an earth movement exclusion, as well as the exclusions for conduct, act, failure to act of a government body and defect, weakness, inadequacy in design, construction, materials, maintenance, etc. The reviewing court held that neither the ultimate cause of the loss (landslide), nor the
 
 *777
 
 stipulated efficient proximate cause (city’s negligent maintenance) were covered perils.
 
 (Id.,
 
 at p. 697.)
 
 Waldsmith,
 
 unlike this case, was a suit between parties to the contract, i.e., the insured sued his insurer unsuccessfully claiming coverage under the contract.